IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )
                                    )
v.                                  )        No. 3:12-CR-53
                                    )
TYRONE CORTEZ COBB and              )        (VARLAN/GUYTON)
YASHAN TRECE CAMPBELL,              )
                                    )
                Defendants.         )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28

U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the

District Court as may be appropriate.  This case was before the Court on November 1, 2012, for

a suppression hearing on the following motions and responses:

(1) Defendant Cobb's Motion to Suppress [Doc. 36], filed on
    August 14, 2012;

(2) Government's Response to Defendant Cobb's Motion to
    Suppress Evidence [Doc. 48], filed on September 20, 2012;

(3) Defendant Campbell's Motion to Suppress [Doc. 50], filed on
    October 10, 2012; and

(4) The United States's Response to Defendant Campbell's Motion
    to Suppress Evidence [Doc. 53], filed on October 24, 2012.

Assistant United States Attorney Cynthia Davidson represented the Government.[1]   Attorney

Wesley D. Stone appeared on behalf of Defendant Cobb, and Attorney Charles T. Webber, Jr.,

---

[1] Sye Hickey, a third-year law school student, conducted the direct examination of the Government's witnesses.

appeared on behalf of Defendant Campbell. Both Defendants were present. The Government presented the testimony of Officer Joseph Mattina with the Knoxville Police Department ("KPD") and KPD Sergeant Ray Offenbacher. At the conclusion of the hearing, the Court granted the Defendants' request for leave to file post-hearing briefs. The Defendants both filed their post-hearing briefs [Docs. 57, 58] on November 26, 2012. The Government filed its responsive post-hearing brief [Doc. 59] on December 3, 2012, merely stating that it relies on the argument in its responses. The Court took the motions, responses, testimony, exhibits, and post-hearing briefs under advisement on December 4, 2012.

## I. POSITIONS OF THE PARTIES

The Defendants are charged in a three-count Indictment [Doc. 1].[2] Both Defendants are charged with one count of felony possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). These charges stem from the December 9, 2011 stop and search of Defendant Cobb's vehicle.

The Defendants argue that officers violated their Fourth Amendment rights to be free of warrantless searches and seizures. They argue that the officer lacked reasonable suspicion or probable cause to stop the vehicle in which Defendant Cobb was the driver and Defendant Campbell was a passenger. Defendant Cobb argues that officers violated his Fifth Amendment rights by failing to advise him of the Miranda warnings prior to questioning him. He also contends that his statements were involuntary. Both Defendants also object to the search, arguing the officers lacked a search warrant and that none of the exceptions to the warrant requirement applied.

---

[2] The third Defendant, Deandre Larenzo Marsh, was convicted pursuant to a guilty plea on June 20, 2012, and did not participate in the suppression hearing.

The Government responds that the officer had probable cause to stop the vehicle in which the Defendants were located because he knew Defendant Cobb's driver's license was suspended and that Defendant Cobb had an outstanding felony warrant for his arrest. It argues that the Miranda warnings were not required in this case because of the concern for public safety and the statements were volunteered. Finally, it asserts that the officers properly searched the vehicle pursuant to the automobile exception and plain view.

## II.     SUMMARY OF EVIDENCE FROM SUPPRESSION HEARING

The Government presented the testimony of two witnesses: KPD Officer Joseph Mattina and KPD Sergeant Ray Offenbacher.

### (A) Testimony of KPD Officer Joseph Mattina

Officer Joseph Mattina testified that he has been a patrol officer with KPD for sixteen years. Officer Mattina stated that he has had several previous interactions with Defendant Cobb. On one occasion, Defendant Cobb was trying to hide drugs. When Officer Mattina approached him, Defendant Cobb resisted arrest and acted violently toward the police. Officer Mattina stated that Defendant Cobb has a negative reputation with KPD, which includes drug and gang activity and "levels of uncooperation with the police."  [Doc. 60 at 9].

Officer Mattina testified that a few days before Defendant Cobb's arrest on December 9, 2011, he was on his way to answer a dispatched call. While driving on Summit Hill in Knoxville, Tennessee, Officer Mattina passed Defendant Cobb, who was driving a 1985 Chevrolet Caprice.

At that time, Officer Mattina conducted a computer search on Defendant Cobb's driver's license, which revealed that it was suspended.

On December 9, 2011, Officer Mattina was on patrol around the Cumberland Avenue area in Knoxville, Tennessee. Officer Mattina testified that he saw Defendant Cobb driving a 1985 blue Chevrolet Caprice. Officer Mattina ran a license plate check to confirm the vehicle was registered to Defendant Cobb. He then conducted another computer search on Defendant Cobb's driver's license, which again showed that it was suspended. In addition, Officer Mattina conducted a NCIC search, which revealed that Defendant Cobb had an outstanding felony warrant for his arrest. The Government entered Exhibit 1, a NCIC transmission log, showing that Officer Mattina checked the database at 9:33 p.m. The Government also entered Exhibit 2, a personal information document showing that Defendant Cobb's driver's license was suspended.

Based on Defendant Cobb's previous history with police officers, Officer Mattina testified that he radioed three other officers to help with the initial stop. Officer Mattina also stated that there were four occupants in Defendant Cobb's vehicle and that he wanted to "even the odds" for officer safety. Officer Mattina pulled in behind Defendant Cobb's vehicle and initiated the traffic stop. The other officers coordinated the "felony stop position," driving beside and behind Officer Mattina's vehicle. Officer Mattina pulled Defendant Cobb over into the Krystal's parking lot on Cumberland Avenue at 9:43 p.m.

Officer Mattina testified that Defendant Cobb was driving the vehicle. He approached the driver's side door, asked Defendant Cobb to step out, and immediately arrested him. During a search incident to the arrest, Officer Mattina found 1.5 to 1.7 grams of marijuana, a rock consisting of 1.5 to 1.7 grams of crack cocaine, and two cell phones on Defendant Cobb's

person. Officer Mattina stated that in his experience the rock of crack cocaine is not typically the amount a drug addict would use and that it "could be cut up into numerous other pieces for sales." [Doc. 60 at 20]. Officer Mattina added that having two cell phones usually indicates that one of them is being used for transactions.

Officer Mattina stated that Defendant Cobb was placed in the back of a cruiser. Officer Mattina asked Defendant Cobb about having weapons in the vehicle. Officer Mattina testified, "I was very blunt about it. I asked about whether there were [sic] any guns in the car." [Doc. 60 at 21]. Officer Mattina continued to ask Defendant Cobb about guns in the vehicle, but Defendant Cobb did not say "no" and shrugged his shoulders. Officer Mattina testified that he was certain that there were guns in the vehicle based upon Defendant Cobb's non-verbal communications. When asked whether Defendant Cobb tried to offer information, Officer Mattina stated that Defendant Cobb "wanted to negotiate the crack for whatever was going to be found in the car." [Doc. 60 at 21].

Officer Mattina signaled to Sergeant Offenbacher that there may be guns in the vehicle and to coordinate safety positions. The officers took the other three passengers out of the vehicle and patted them down for weapons but found nothing. The officers had the passengers stand away from the vehicle. Officer Mattina testified that the officers may have handcuffed some of the passengers.

After the passengers were removed from the vehicle, Officer Mattina testified that he wanted to determine if he could see anything while standing outside the vehicle. He stated that he was never attempting to search. Officer Mattina stated that he saw part of a handgun underneath the driver's seat and told Sergeant Offenbacher. Sergeant Offenbacher then looked

in the backseat and found another gun. At that point, after finding two guns in the vehicle, Officer Mattina and Sergeant Offenbacher stopped searching and called the crime lab to assist in the search, obtain fingerprints, and take photographs.

Officer Mattina testified that the forensic team arrived and searched the entire vehicle. Among the items found were three guns: (1) a Smith & Wesson 9 millimeter with one round in the chamber and twenty three rounds in the magazine located underneath the driver's seat; (2) Kel-Tec PF-9, 9 millimeter with six rounds and one in the chamber, which was found underneath the passenger's seat; and (3) a Taurus Millennium 9 millimeter with ten rounds and one in the chamber, which was found in the pocket of the passenger's rear seat. The forensic team removed the weapons and took them to confiscations. The Government entered Exhibits 3 and 4, which are both photographs of Defendant Cobb's vehicle taken by the forensic team. In addition, the Government entered Exhibit 5, a photograph of the floor below the driver's seat that shows the gun protruding from underneath the seat. Finally, the Government entered and played portions of Exhibit 6, a video taken from Officer Mattina's police cruiser. Officer Mattina stated that the individuals in the vehicle were transported to the Repeat Offender's Unit.

On cross-examination by Attorney Webber, Officer Mattina testified that he arrested Defendant Cobb several years ago. A few days before the December 9, 2011 arrest, Officer Mattina saw Defendant Cobb driving a Chevrolet Caprice on Summit Hill in Knoxville, Tennessee. He stated that he did not stop Defendant Cobb at that time because he was answering a dispatched call, which took priority over a person driving on a suspended driver's license. Officer Mattina could not recall what specific dispatched call he was answering.

Officer Mattina testified that on December 9, 2011, he did not observe Defendant Cobb engaging in any criminal activity other than driving on a suspended license. He stated that if Defendant Cobb's driver's license was valid and the NCIC check revealed no warrants, he would have continued driving without pulling Defendant Cobb over. Officer Mattina stated that he could not remember if he asked Defendant Cobb for identification on the night of the arrest. He stated that he knows Defendant Cobb, but sometimes, even if he knows the person he has stopped, he will ask for identification just to "ease tension" and make the person feel as though it is just a regular traffic stop. [Doc. 60 at 39].

Officer Mattina testified that on the night of December 9, 2011, he "knew for sure" it was Defendant Cobb driving. He stated that the woman in the vehicle was released because he did not believe she was involved in any criminal activity. In addition, he testified that after everything was secure, he returned to Defendant Cobb's vehicle and saw the gun underneath the driver's seat. He stated that he was standing beside the driver's side mirror. He did not touch the gun until the forensics team arrived.

On cross-examination by Attorney Stone, Officer Mattina repeated that he could not remember what specific call he was answering when he saw Defendant Cobb driving on Summit Hill, and he could not recall if the car he saw was blue or brown. Officer Mattina testified that on December 9, 2011, when he first stopped the vehicle, he did not know the other occupants in the vehicle. He was not aware that Defendant Cobb had two previous court dates and that the report from those court hearings show that Defendant Cobb had a valid driver's license. He also stated that he does not remember checking the expiration date on Defendant Cobb's license.

Officer Mattina testified that he did not administer <u>Miranda</u> rights to Defendant Cobb upon arrest, and he asked several questions about whether there were weapons in the vehicle. He also testified that after Defendant Cobb was handcuffed, he admitted that he had an "eight-ball."

Officer Mattina testified that he was standing next to the driver's side mirror when he saw the gun's "barrel with the slide sticking out from the seat." [Doc. 60 at 56]. Finally, he testified that the information in the NCIC is not always correct.

On redirect examination, Officer Mattina testified that he asked Defendant Cobb about having weapons in the vehicle because he was concerned for officer safety. On recross examination, Officer Mattina testified that Exhibit 2 shows that the information on Defendant Cobb's driver's license was last updated in 2007.


*(B) Testimony of KPD Sergeant Ray Offenbacher*

Sergeant Ray Offenbacher testified that he has worked for KPD for eighteen years and is now the Western District Supervisor. He stated that he is aware that Defendant Cobb has a history of violence with other KPD officers but testified that he had not had direct interaction with Defendant Cobb before December 9, 2011.

Sergeant Offenbacher testified that on December 9, 2011, Officer Mattina radioed that he was going to initiate a traffic stop because Defendant Cobb was driving on a suspended license and a felony warrant had been issued for his arrest. Sergeant Offenbacher stated that when Officer Mattina radioed him, he referred to Defendant Cobb by name. He testified that the reference to "Blue Momma" that was heard on the police cruiser videotape was a name that continued to display on Defendant Cobb's cell phone, after he had been placed in custody.

8

On cross-examination, Sergeant Offenbacher testified that his assignment on December 9 was to assist Officer Mattina and make sure Defendant Cobb did not flee. He stated that he pulled in front of Defendant Cobb's vehicle on Cumberland Avenue before Officer Mattina initiated the stop. When Officer Mattina initiated the stop, Defendant Cobb pulled into the Krystal's parking lot. Sergeant Offenbacher circled around to the back of Krystal's and then drove into the parking lot. When Offenbacher arrived, Defendant Cobb was stepping out of the vehicle. Sergeant Offenbacher testified that Defendant Cobb was calm and not hostile. He stated that he was present when Officer Mattina questioned Defendant Cobb with regard to having guns in the vehicle. Finally, he stated that he did not administer Miranda warnings to Defendant Cobb.

### III.    FACTUAL FINDINGS

Based upon the testimony and exhibits presented at the November 1 hearing, the Court makes the following findings of fact:

A few days before December 9, 2011, Officer Mattina saw Defendant Cobb driving a Chevrolet Caprice on Summit Hill in Knoxville, Tennessee. Officer Mattina checked Defendant Cobb's driver's license and found that it had been suspended. At that time, Officer Mattina did not stop Defendant Cobb because he was answering a dispatched call, which took priority.

On December 9, 2011, while on patrol, Officer Mattina saw Defendant Cobb driving around the Cumberland Avenue area in a Chevrolet Caprice. Officer Mattina checked Defendant Cobb's driver's license again and found that it was still suspended. In addition, a NCIC check revealed that Defendant Cobb had an outstanding arrest warrant for felony theft. Due to Defendant Cobb's violent history with police officers, Officer Mattina radioed several officers to

help him initiate a traffic stop. The other officers coordinated the "felony stop position." Officer Mattina pulled Defendant Cobb over in the Krystal's parking lot at 9:43 p.m., ten minutes after he checked the NCIC database.

Officer Mattina approached the driver's side of Defendant Cobb's vehicle, asked Defendant Cobb to step out, and immediately arrested him. While Officer Mattina was arresting Defendant Cobb, Sergeant Offenbacher pulled into the parking lot in order to assist Officer Mattina.

After placing handcuffs on Defendant Cobb, Officer Mattina conducted a search incident to the arrest and found 1.5 to 1.7 grams of marijuana, a rock consisting of 1.5 to 1.7 grams of crack cocaine, and two cell phones on Defendant Cobb's person. Defendant Cobb was then placed in the back of a police cruiser. Officer Mattina became concerned that there were weapons in the vehicle because he did not know the other occupants in the vehicle. Without administering Miranda warnings, Officer Mattina asked Defendant Cobb whether there were any weapons in the vehicle. Because Defendant Cobb did not say "no," Officer Mattina continued to question about the presence of weapons. Defendant Cobb shrugged his shoulders and made other non-verbal communications, which led Officer Mattina to believe that there were weapons in the vehicle.

Officer Mattina signaled to Sergeant Offenbacher to coordinate safety positions. The officers made the three remaining passengers in the vehicle exit. They were all patted down for weapons but nothing was found. Several of them were placed in handcuffs. After the passengers were secure, Officer Mattina returned to the vehicle. While standing beside the driver's side mirror, Officer Mattina saw a partially hidden handgun underneath the driver's seat. Officer

Mattina did not touch the gun but told Sergeant Offenbacher that there was a gun underneath the driver's seat. Sergeant Offenbacher then searched the backseat and found another gun. After finding two guns in the vehicle, Officer Mattina and Sergeant Offenbacher stopped searching and called the crime lab to assist in the search, obtain fingerprints, and take photographs.

The crime lab arrived and continued the search. Ultimately, the search revealed three loaded guns. The forensics team took photographs of the scene and took the guns to confiscations. The passengers were then taken to the Repeated Offenders Unit.

## IV.    ANALYSIS

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. A search conducted without a warrant is unreasonable "subject only to a few specifically established and well-delineated exceptions." Clemente v. Vaslo, 679 F.3d 492, 489 (6th Cir. 2012) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). The present matter involves three "well-delineated exceptions," which include: (1) a search incident to an arrest, Michigan v. DeFillippo, 443 U.S. 31 (1979); (2) the plain view doctrine, Horton v. California, 496 U.S. 128 (1990); and (3) the automobile exception, United States v. Smith, 510 F.3d 641 (6th Cir. 2007). In addition, an officer may stop and briefly detain a person for investigative purposes, when that officer has "reasonable suspicion" based on articulable facts, that "criminal activity [is] afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). Absent probable cause, only brief detention is permitted.

Both Defendants challenge the initial stop and the subsequent search of Defendant Cobb's vehicle. The Defendants assert that as a result of the unlawful search and seizure, the

evidence from the search of the vehicle should be suppressed. Defendant Cobb also challenges the constitutionality of the statements he made on December 9, 2011. Because the Defendants' motions are similar, the Court will analyze them together. The Court will first address whether the stop was lawful, will next evaluate the propriety of Defendant Cobb's statements, and finally will consider whether the subsequent search of Defendant Cobb's vehicle was reasonable.

## A. Initial Stop

The Defendants both argue that Officer Mattina did not have reasonable suspicion to stop Defendant Cobb's vehicle. They allege that Officer Mattina was unsure as to who was driving the vehicle, thus calling into question that Officer Mattina knew the driver had a felony warrant for his arrest. In addition, at the November 1 suppression hearing, the Defendants argued that Defendant Cobb's driver's license was not suspended. Finally, Defendant Campbell asserts that the database search was unwarranted and "flagrantly abusive" of Defendant Cobb's Fourth Amendment rights.

As mentioned above, the Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. Const. amend. IV. It is well-established that in Fourth Amendment terms, a traffic stop entails a seizure of the driver. Delaware v. Prouse, 440 U.S. 648, 653 (1979). In addition, the Supreme Court has articulated that a traffic stop constitutes a seizure of the passengers in a vehicle as well. Brendlin v. California, 551 U.S. 249, 251 (2007) ("We hold that a passenger is seized as well and so may challenge the constitutionality of the stop."). The seizure of a person that occurs during an investigative stop of a vehicle comports with the Fourth

Amendment only if officers have reasonable suspicion that "criminal activity may be afoot" to justify the stop. Terry, 392 U.S. at 30.

The Court of Appeals for the Sixth Circuit recommends a two-part test to determine the legitimacy of an investigatory stop. United States v. Luqman, 522 F.3d 613, 616-17 (6th Cir. 2008); see also United States v. Davis, 430 F.3d 345, 354 (6th Cir. 2005). First, a court must determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." Davis, 430 F.3d at 354 (quoting United States v. Garza, 10 F.3d 1241, 1245 (6th Cir. 1993)). If the basis for the Terry stop was proper, then the Court must determine "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." Id. (quoting Garza, 10 F.3d at 1245). In United States v. Cortez, the Supreme Court explained the definition of reasonable suspicion:

> The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of a vehicle. An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity . . . the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

449 U.S. 411, 417-18 (1981) (internal citations omitted).

By proceeding to analyze the subsequent events, we are in effect looking into the degree of intrusion.

13

In the present matter, the Court finds that Officer Mattina not only had reasonable suspicion to initiate a stop but had probable cause as well. See United States v. Mans, 999 F.2d 966, 968 (6th Cir. 1993) (finding that the stop was reasonable because the officer knew that the defendant's driver's license had been revoked). Several days before Defendant Cobb's arrest, Officer Mattina saw him driving. Officer Mattina conducted a computer search on Defendant Cobb's driver's license, which revealed it had been suspended. At that time, Officer Mattina did not stop Defendant Cobb because he was answering a dispatched call, which took priority over a person driving on a suspended license.

Later, on December 9, 2011, Officer Mattina was patrolling the Cumberland Avenue area in Knoxville, Tennessee. Although in their briefs the Defendants question whether Officer Mattina actually saw Defendant Cobb driving that night, Officer Mattina testified that he was certain that he saw Defendant Cobb driving. As shown in Government Exhibit 1, Officer Mattina checked Defendant Cobb's name in the NCIC database ten minutes before he initiated the stop. Two computer searches confirmed that Defendant Cobb's driver's license was suspended and a warrant had been issued for his arrest. In addition, Sergeant Offenbacher testified that Officer Mattina radioed him and reported that he was about to initiate a stop because Defendant Cobb was driving on a suspended driver's license and that there was a felony warrant out for his arrest. Finally, Sergeant Offebacher also testified that Officer Mattina mentioned Defendant Cobb by name on the radio. These facts clearly establish that Officer Mattina knew who was driving the vehicle before he initiated the stop. The Court also finds that Officer Mattina's and Sergeant Offenbacher's testimonies were credible and not impeached by the Defendants.

The Defendants argued at the suppression hearing that Defendant Cobb's license was in fact valid, and the computer search regarding his license yielded inaccurate results. Even if the Defendants' assertions are true, it remains of little consequence. See Herring v. United States, 555 U.S. 135, 137 (2009) (applying the good faith exception to the officer's actions after a computer search revealed that the defendant had an active warrant for his arrest but failed to show that it had been recalled). More importantly, it remains undisputed that Defendant Cobb had a felony warrant out for his arrest. This information alone established probable cause not only to initiate a traffic stop but to arrest Defendant Cobb.

Finally, Defendant Campbell asserts that the computer search was unreasonable pursuant to the Fourth Amendment. "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" California v. Ciraola, 476 U.S. 207, 211 (1986) (citation omitted). The question Defendant Campbell poses is whether a computer database search implicates the Fourth Amendment.

Without providing any legal support for this argument, Defendant Campbell insists that a law enforcement officer must have reasonable suspicion to search the NCIC database for a person's information. Many courts have held that computer database searches are not subject to Fourth Amendment analysis. In fact, "[t]he obvious purpose of maintaining law enforcement databases is to make information, such as the existence of outstanding warrant, readily available to officers carrying out legitimate law enforcement duties." United States v. Ellison, 462 F.3d 557, 562 (6th Cir. 2006) (finding no expectation of privacy in an officer's search of the Law Enforcement Information Network, which revealed an outstanding warrant); see also Eagle v. Morgan, 88 F.3d 620, 628 (8th Cir. 1996) (finding that a NCIC search did not violate the

plaintiff's federal constitutional rights); <u>Cincerella v. Egg Harbor Township Police Dept.</u>, No. 06-1183 (RBK), 2009 WL 792489, at *3 (D. N.J. Mar. 23, 2009) (stating that "[b]ecause a person has no reasonable expectation of privacy in the information in the NCIC database, searching a person's record through the NCIC database does not violate the federal or state constitution"); <u>United States v. Schmid</u>, No. 3:06-CR-97, 2007 WL 540788, at *5 (E.D. Tenn. Feb. 15, 2007) (finding probable cause after the officer entered the vehicle's license plate number and received a NCIC reporting indicating that the vehicle was associated with the defendants, who had outstanding federal warrants). Therefore, the Court finds that Officer Mattina did not violate the Fourth Amendment when he conducted the computer searches.

Accordingly, the Court finds that Officer Mattina had probable cause to believe that Defendant Cobb was committing the crime of driving without a valid license and that he had a warrant for his arrest on December 9, 2011. Thus, Officer Mattina properly stopped Defendant Cobb's vehicle and placed Cobb into custody.

## B. Defendant Cobb's Statements

Defendant Cobb argues that Officer Mattina used his statements regarding the presence of guns in the vehicle to assert probable cause to search. He asserts that his statements should be suppressed, thus leaving Officer Mattina without probable cause for the search. The Government responds that Officer Mattina was not required to immediately read Defendant Cobb his <u>Miranda</u> rights because there was a concern for public safety. The Government contends that Defendant Cobb's reactions to Officer Mattina's questions led to a reasonable belief that there was a firearm in the vehicle.

16

Neither Defendants nor the Government identified the exact statements that Defendant Cobb allegedly made. At one point, during Officer Mattina's testimony, he stated that Defendant Cobb admitted to having an "eight ball" and that Defendant Cobb tried to "negotiate the crack cocaine for whatever was going to be found in the car." [Doc. 60 at 21]. The Court is unsure as to when these statements were made and whether they were in response to "express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). Both parties, however, agree that Defendant Cobb reacted to Officer Mattina's questions. The Government argues that Defendant Cobb's reactions led to "a reasonable belief that there was a firearm in the vehicle." [Doc. 48 at 10]. Although not raised by the parties, the Court observes that the "statement" Defendant Cobb seeks to suppress is actually a gesture, that of him shrugging his shoulders and other nonverbal communication, upon Officer Mattina asking whether there were guns in the vehicle. The Court has not located any case law speaking to the issue of whether gestures are subject to suppression for failure to advise of Miranda warnings. The Court notes that gestures can constitute valid consent under Fourth Amendment jurisdiction. United States v. Taylor, No. 96-4169, 1998 WL 109979, at *6 (6th Cir. Mar. 4, 1998) ("This circuit and others have held that non-verbal actions, considered with other factors, can constitute voluntary consent to searches in analogous contexts."). The Court also observes that gestures are considered testimonial. Pennsylvania v. Muniz, 496 U.S. 582, 616 n.9 (1990) ("[N]onverbal conduct contains a testimonial component whenever the conduct reflects the actor's communication of his thoughts to another."); see also Schmerber v. California, 384 U.S. 757, 761 n.5 (1966) ("A nod or head-shake is as much as 'testimonial' or 'communicative' act in this sense as are spoken

words."). Accordingly, the Court will treat the Defendant's aforementioned shrug and nonverbal communications as a statement for purposes of the Miranda analysis.

The Fifth Amendment guarantees the right to remain silent and the right to assistance of counsel during a custodial interrogation. Tolliver v. Sheets, 594 F.3d 900, 916 (6th Cir. 2010). In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); United States v. Crowder, 62 F.3d 782, 786 (6th Cir. 1995) ("Miranda warnings are only required when the Defendant is in custody and subject to interrogation."). Interrogation has been defined as "express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). The "functional equivalent" of questioning includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Pennsylvania v. Muniz, 496 U.S. 582, 600-01 (1990) (quoting Innis, 446 U.S. at 301).

Although the Fifth Amendment protects a person's right to remain silent, it is well-established that an exigent circumstance operates as an exception to the Miranda warnings. New York v. Quarles, 467 U.S. 649, 656 (1984); United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001). Under this exception, in order to excuse Miranda, officers must "have a reasonable belief based upon articulable facts that they are in danger." Talley, 275 F.3d at 563. In United States v. Williams, 483 F.3d 425, 428 (6th Cir. 2007), the court explained:

> Our evaluation takes into consideration a number of factors, which may include the known history and characteristics of the suspect, the known facts and circumstances of the alleged crime, and the facts and circumstances confronted by the officer when he undertakes the arrest. For an officer to have a reasonable belief that he is in danger, at a minimum, he must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and

18

(2) that someone other than the police could access the weapon and inflict harm with it. The public safety exception applies if and only if both of those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety.

As an initial matter, it is clear, and the parties have not argued otherwise, that Defendant Cobb was in custody at the time Officer Mattina questioned him with regard to having weapons in the vehicle. The test to determine when an individual has been seized is whether a reasonable person in those circumstances would have felt he or she was not free to leave. Michigan v. Chesternut, 486 U.S. 567, 572 (1988); United States v. Smith, 594 F.3d 530, 536 (6th Cir. 2010). Defendant Cobb was handcuffed and placed in the back of a police cruiser. In addition, Officer Mattina clearly interrogated Defendant Cobb. After arresting Defendant Cobb, Officer Mattina continued to ask him questions with regard to whether there were guns hidden in the vehicle. See Muniz, 496 U.S. at 600-01; Innis, 446 U.S. at 300-01. Therefore, the Court finds that the Defendant was in custody and was interrogated. The next question the Court must address is whether the public safety exception is applicable to the present statements.

It is undisputed that Defendant Cobb was not read his Miranda rights at the time of his arrest. Officer Mattina testified that after pulling Defendant Cobb's vehicle over, he immediately arrested Defendant Cobb on the outstanding felony warrant. After a pat-down search revealed 1.5 to 1.7 grams of marijuana, a rock of crack cocaine, and two cell phones, Officer Mattina testified that he asked Defendant Cobb about having weapons in the vehicle, to which Defendant Cobb shrugged his shoulders. Officer Mattina continued to ask Defendant Cobb whether there were weapons in the vehicle. Due to Defendant Cobb's non-verbal reactions to his questions,

Office Mattina testified that he "became certain" that there were weapons in the vehicle and signaled to Sergeant Offenbacher to coordinate safety positions.

Clearly, the second prong of the public safety exception has been met. Compare United States v. Kellogg, 306 F. App'x 916, 924 (6th Cir. 2009) (finding that the second prong had not been met because the defendant was already handcuffed, all the occupants were out of the duplex, and there was no reason to believe the gun would be "immediately accessible" to any individual other than police). Although Defendant Cobb was already placed in handcuffs, there were three other occupants that remained in the vehicle. At the time of Defendant Cobb's arrest, Officer Mattina did not know the other occupants in the vehicle, and it is easily conceivable that one of the occupants could have inflicted harm. In addition, Officer Mattina's actions, namely— coordinating to Sergeant Offenbacher to initiate safety positions—demonstrates that Officer Mattina was aware that one of the passengers could have inflicted harm if a gun was inside the vehicle. Accordingly, the Court finds that the second prong to the public safety exception has been met under the present facts.

The Court does not find that the first prong, reason to believe that the defendant has a weapon, has been met under these facts. First, Defendant Cobb's arrest warrant was for felony theft. Other than Officer Mattina's testimony regarding the existence of an arrest warrant for felony theft, the Court has no other facts surrounding the circumstances of the alleged theft. Second, although Officer Mattina testified that he had prior physical altercations with Defendant Cobb, there was no testimony that the previous altercations involved any weapons. In addition, Officer Mattina testified that Defendant Cobb had a reputation for drug and gang activity, but again, there was no testimony that the Defendant had a reputation for using weapons. Moreover,

20

while some cases have noted that "drug traffickers have a propensity to carry weapons," it is not completely clear that Officer Mattina suspected that Defendant Cobb was engaged or had engaged in drug trafficking. United States v. Mohammed, No. 10-4145, 2012 WL 4465626, at *12 (6th Cir. Sept. 28, 2012) (citing United States v. Williams, 272 F. App'x 473, 477-78 (6th Cir. 2008)).

Based upon the circumstances in this particular case, the Court does not find the presence of exigent circumstances to excuse the Miranda warnings. See United States v. Kellogg, 306 F. App'x 916, 924 (6th Cir. 2009) (suspicion that the defendant committed armed robbery satisfied the first prong); Talley, 275 F.3d at 564 (holding that after the officer saw the magazine and ammunition, "he had reason to believe a gun was nearby and was justified . . . in asking his question prior to administering a Miranda warning"); United States v. Sutton, No. 3:09-cr-139, 2010 WL 2245015, at *4 (E.D. Tenn. May 28, 2010) (holding that the public safety exception applied because a radio dispatch indicated that the defendant had a gun and the defendant reached towards his waist after having been told to put his hands in the air); United States v. Baylis, No. 3:08-cr-147, 2009 WL 454334, at *18 (E.D. Tenn. Feb. 23, 2009) (holding that although the defendant had been handcuffed, the public safety exception applied because the officer executing the warrant was told he was looking for drugs, individuals might be armed, and the residence had recently been the location of a home invasion where someone was shot); United States v. Lewis, No. 08-20028, 2008 WL 4849910, at *7 (W.D. Tenn. Nov. 6, 2008) (public safety exception applied when officers were investigating a drug complaint, investigation involved multiple criminal gang members, one officer thought he saw ammunition, the

21

investigation occurred in a high drug-trafficking area, and the officers were dealing with multiple individuals).

Unlike the cases cited, there was no evidence, at the time of Defendant Cobb's arrest, that he possessed a gun. Accordingly, the Court finds that the public safety exception to the <u>Miranda</u> requirement is not applicable to the present facts. Although Defendant Cobb's non-verbal reactions cannot be considered to establish probable cause for the search, the Court finds, as explained below, that the plain view and automobile exceptions to the search warrant are applicable, even without considering Defendant Cobb's gestures.

## C. Search of the Vehicle

The Defendants argue that the search of the vehicle was invalid. The Court examines the propriety of the search of Defendant Cobb's vehicle based upon three exceptions to the warrant requirement: (1) the search incident to the arrest exception; (2) the plain view doctrine; and (3) the automobile exception.

### (i)     Search Incident to the Arrest Exception

Defendant Campbell argues that Officer Mattina's actions are sufficient to trigger the exclusionary rule. He asserts that pursuant to <u>Arizona v. Gant</u>, 556 U.S. 332 (2009), officers may only search a vehicle if the arrestee is within reaching distance of the passenger compartment or if the officers have a reasonable belief that the vehicle contains evidence for which the suspect was arrested. Defendant Campbell maintains that these two exceptions to the search warrant

requirement do not apply to the present facts. The Government does not respond to Defendant Campbell's argument but argues other exceptions apply.

In Gant, the Supreme Court limited the search incident to the arrest exception by stating that a subsequent search of a vehicle was only proper if officers reasonably believe that evidence of the offense for which the defendant was arrested might be found in the vehicle or "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." 556 U.S. at 343. In the present matter, the Government does not argue, nor does the Court find, that the search incident to the arrest exception applies in this case. First, Defendant Cobb had already been secured. He was handcuffed and placed in the back of a police cruiser. Second, Officer Mattina did not testify that he had reason to believe evidence of felony theft was located in the vehicle. In addition, Officer Mattina could not have expected to find evidence of driving with a suspended license in Defendant Cobb's vehicle. See id. at 344.

Accordingly, the Court finds that the search incident to the arrest does not apply to the present facts.

*(ii)    Plain View*

The Government argues that the warrantless search of Defendant Cobb's vehicle was valid because the plain view exception to the search warrant is applicable. Defendant Cobb argues that the facts do not establish the necessary prerequisites for the plain view exception.

Under the plain view doctrine, officers may seize contraband without a warrant. See Minnesota v. Dickerson, 508 U.S. 366, 375 (1993); United States v. Herndon, 501 F.3d 683, 692 (6th Cir. 2007). In order to invoke the plain view exception, the evidence must be "(1) in plain

view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be seen; and (4) seized by an officer who has lawful right of access to the object itself." United States v. Calloway, 116 F.3d 1129, 1133 (6th Cir. 1997) (quoting United States v. Roark, 36 F.3d 14, 18 (6th Cir. 1994)) (other citations omitted). In addition, "[A] motorist has 'no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.'" United States v. Bradshaw, 102 F.3d 204, 211 (6th Cir. 1996) (quoting Texas v. Brown, 460 U.S. 730, 740 (1983)). Finally, the burden rests upon the Government to prove the exception applies. Herndon, 501 F.3d at 692.

In the present matter, after Defendant Cobb and the other occupants were detained, Officer Mattina testified that he walked to the driver's side door and noticed a gun that was partially hidden underneath the driver's seat.

The Court finds that the first and third prongs to the plain view exception have been met. First, Officer Mattina walked to the driver's side door and saw a partially hidden gun underneath the driver's seat. Government Exhibit 5 clearly shows the gun protruding from the driver's seat. Second, this Court has already concluded that the stop was valid. Therefore, Officer Mattina was lawfully in the Krystal's parking lot, from which he viewed the gun.

The second prong is whether the gun's incriminating nature was immediately apparent. The Sixth Circuit "has long deliberated what 'immediately apparent' means." United States v. McLevain, 310 F.3d 434, 441 (6th Cir. 2002). In McLevain, the court discussed three factors that are not necessary but helpful in determining whether an item's incriminating nature was immediately apparent. The factors include:

> (1) [A] nexus between the seized object and the items
> particularized in the search warrant; (2) whether the intrinsic
> nature or appearance of the seized object gives probable cause to
> believe that it is associated with criminal activity, and (3) whether
> the executing officers can *at the time* of discovery of the object on
> the facts then available to them determine probable cause of the
> object's incriminating nature.

Id. (quoting United States v. Beal, 810 F.2d 574, 576-77 (6th Cir. 1987)) (emphasis in original).

As an initial matter, the first and second factors are not relevant to the Court's inquiry because there was no search warrant issued for Defendant Cobb's vehicle and there is nothing intrinsically criminal with regard to Defendant Cobb's gun. Thus, the Court will proceed to discuss the third factor.

The Government first argues in its brief that Officer Mattina had "constructive knowledge" that the Defendant was a convicted felon after he conducted a NCIC search. While Officer Mattina testified that he knew Defendant Cobb because he had previous incidents with Defendant Cobb, there was no testimony regarding whether Officer Mattina actually knew that Defendant Cobb was a convicted felon. See Beal, 810 F.2d at 576 (finding that the plain view exception did not apply when the officer knew that the defendant "was not a felon for whom mere possession of a weapon would be illegal"); United States v. Lurry, 483 F. App'x 252, 253 (6th Cir. 2012) (finding that the "criminality of the shotgun shells was not immediately apparent because [the defendant's] possession of them was illegal only due to his status as a felon") United States v. Parks, No. 1:08-cr-58, 2009 WL 3817435, at *5-7 (E.D. Tenn. Nov. 13, 2009) (finding that the plain view exception was applicable because the officer knew that the defendant was a convicted felon).  In fact, the only testimony regarding the NCIC search was that it revealed a felony warrant for Defendant Cobb's arrest. Furthermore, there was no testimony that

any of the other occupants in the vehicle were known convicted felons. It is not *per se* illegal to possess a gun. Therefore, there was nothing about the "intrinsic nature" of the gun that proclaimed it as contraband.

In the alternative, the Government argues that Officer Mattina had probable cause to associate the firearm with the Defendant's criminal history. The Government's alternative argument seems to implicate the third <u>Beal</u> factor. "Under the plain view doctrine, an item seized cannot satisfy the immediately incriminating requirement unless the officer who discovers and seizes the item has probable cause to associate the item with criminal activity." <u>United States v. Tatman</u>, 397 F. App'x 152, 175 (6th Cir. 2010). Courts have equated the "immediately apparent" factor to probable cause. <u>United States v. Davis</u>, 635 F. Supp. 2d 752, 759 (E.D. Tenn. 2009) ("Immediately apparent meaning that the officer had probable cause to believe that the object was evidence of a crime."). As such, an officer is not required to "*know* that evidence is contraband. Instead, 'probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband . . .." <u>McLevain</u>, 310 F.3d 441 (6th Cir. 2002) (quoting <u>Brown</u>, 460 U.S. at 742) (emphasis in original). If further investigation is required to establish criminal activity, "the item is not immediately incriminating." <u>Tatman</u>, 397 F. App'x at 175 (quoting <u>McLevain</u>, 310 F.3d at 443).

The Court finds that the third factor has been met. <u>Compare</u> <u>Mason v. City of Warren Police Dept.</u>, No. 10-cv-14182, 2011 WL 5025841, at *6 (E.D. Mich. Oct. 21, 2011) (stating that "case law supporting an association between illegal activity and a pill bottle merely observed generally depends on something more than the presence of a pill bottle alone"). Here, unlike

Mason, there was more than the presence of a gun. After arresting Defendant Cobb, a pat-down search revealed marijuana, a large rock of crack cocaine, and two cell phones. After the passengers exited the car, Officer Mattina saw a handgun protruding from underneath Defendant Cobb's seat. The gun, coupled with the Defendant's well-known history of drug and gang activity and the marijuana, crack cocaine, and two cell phones found on Defendant Cobb, establishes probable cause to believe that the gun was evidence of a crime. See United States v. Watkins Street Project, LLC, No. 1:09-cr-144, 2010 WL 6789313, *13-24 (E.D. Tenn. Oct. 28, 2010) (finding that even though a laboratory test was required for certainty, "the plain view doctrine does not require certainty, only probable cause to believe the items in plain view are evidence of a crime"). Accordingly, the Court finds that the gun underneath Defendant Cobb's seat was immediately incriminating.

The remaining question under the plain view doctrine is whether Officer Mattina had a lawful right of access to the interior of the vehicle.[3] The fourth requirement is "meant to guard against warrantless entry onto premises whenever contraband is viewed from off the premises in the absence of exigent circumstances, but does not bar the seizure of evidence in a parked car." Boone v. Spurgess, 385 F.3d 923, 928 (6th Cir. 2004) (internal citations omitted). In addition, "The difference between 'lawfully position' and 'lawful right of access' is thus that the former refers to where the officer stands when she sees the item, and the latter to where she must be to retrieve the item." Id. The Sixth Circuit has articulated that this factor "turns on [the] application of the automobile exception. The automobile exception allows a warrantless search of an automobile if officers have probable cause to believe the vehicle contains evidence of a crime." United States v. Galaviz, 645 F.3d 347, 357 (6th Cir. 2011); see also United States v. McGhee,

---

[3] Although Officer Mattina testified that he did not immediately remove or touch the gun, he later seized it when the crime lab unit arrived.

672 F. Supp. 2d 804, 812 (S.D. Ohio 2009) (finding that the officer had a lawful right of access to the [evidence] because . . . she had probable cause to believe that evidence of drug offenses would be found in the vehicle).

The Court finds that Officer Mattina had a lawful right of access to the interior of the vehicle where Officer Mattina saw the gun. The gun was found underneath Defendant Cobb's seat. Defendant Cobb was just recently arrested and searched, and the search revealed that Defendant Cobb had marijuana, a large rock of crack cocaine, and two cell phones on his person. Officer Mattina testified that in his experience the amount of crack cocaine found on Defendant Cobb is not typically the amount used by drug addicts and that having an extra cell phone indicates that at least one phone is used for transactions. In addition, Officer Mattina was aware of the Defendant's reputation for drug and gang activity. These facts are sufficient to establish that the automobile exception applies to the interior of the vehicle where Officer Mattina saw the gun. See Galaviz, 645 F.3d at 357 (finding that the officers had a lawful right of access to the interior of a locked vehicle in order to seize the gun).

Accordingly, the Court finds that the plain view exception is applicable to the present facts.


(iii)     <i>Probable Cause to Search the Vehicle</i>

The Government argues that Officer Mattina complied with the Fourth Amendment in searching the Defendant's vehicle without a warrant because there was probable cause to believe that Defendant's vehicle contained contraband and other evidence of illegal activity. The Government asserts that Officer Mattina had probable cause to search Defendant Cobb's vehicle

28

after a pat-down revealed that Defendant Cobb was in possession of marijuana and crack cocaine. In addition, the Government contends that once Officer Mattina saw the gun in the vehicle, coupled with the fact that he found drugs on Defendant Cobb and was aware of Defendant Cobb's violent character, Officer Mattina "unquestionably had probable cause." [Doc. 48 at 9].

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The right is protected by the requirement that a warrant issued by an independent judicial officer must be obtained before a search is undertaken. California v. Carney, 471 U.S 386, 390 (1985). One well-established exception to the general rule is the so-called "automobile exception" to the warrant requirement. Carroll v. United States, 267 U.S. 132 (1925). In Carroll, the Supreme Court held that the capacity of an automobile to be moved quickly justifies a lesser degree of protection of Fourth Amendment rights. Id. at 154. Subsequent cases extended the rationale for applying the automobile exception. See Carney, 471 U.S. at 391 (reasoning that "less rigorous warrant requirement's govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office").

"If a vehicle is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam); United States v. Cope, 312 F.3d 757, 775 (6th Cir. 2002) ("The automobile exception is applicable even in nonexigent circumstances, so long as the vehicle is mobile and law enforcement officers have probable cause to believe that it contains incriminating evidence.").

"The test for 'probable cause' is simply whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." Cope, 312 F.3d at 775 (quoting United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998)). The Sixth Circuit has also defined probable cause as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). In determining whether probable cause exists, the Court must look to the objective facts known to the officers at the time of the search and not to events that occurred after the search or to the officers' subjective intent. Smith v. Thornburg, 136 F.3d 1070, 1075 (6th Cir. 1998).

The Sixth Circuit has repeatedly held that the discovery of drugs in a vehicle gives probable cause to search the entire vehicle. United States v. Burns, 298 F.3d 523, 542 (6th Cir. 2002) ("Once the bag of crack cocaine was found in plain view, the officers had probable cause to believe that other contraband might be in the car"); United States v. Burnett, 791 F.2d 64, 67 (6th Cir. 1986) ("Once the contraband [marijuana package] was found, [the officer] had every right to search the passenger area of the car, the trunk, and any and all containers which might conceal contraband."). The more difficult question, however, is whether an officer may search a vehicle pursuant to finding drugs on the driver. But see United States v. Allen, No. 4:08-cr-40, 2009 WL 3297286, at *4 (E.D. Tenn. Oct. 13, 2009) (citing with approval a Seventh Circuit decision applying the automobile exception to the search warrant requirement after a search incident to the arrest revealed a bag of cocaine on the driver).[4]

---

[4] In United States v. Johnson, 383 F.3d 538, 545 (7th Cir. 2004), the court held that probable cause existed to search the defendant's car. The defendant was pulled over, and the officer identified him as having an outstanding warrant for his arrest. Id. at 540. The officer arrested the defendant and performed a pat down search, which revealed powdered cocaine Id. at 541. The court stated that the powdered cocaine "alone provided [the officer] with probable cause that a crime had been, or was being committed and, therefore, he was not violating [the defendant's] constitutional right when searching the vehicle, *including the trunk*." Id. at 545 (emphasis in original).

Regardless if there was probable cause to search Defendant Cobb's vehicle after Officer Mattina found drugs on Defendant Cobb, the officer had probable cause, for the reasons explained above, to search the entire vehicle after he saw the gun underneath Defendant Cobb's seat. Just before Officer Mattina saw the gun underneath Defendant Cobb's driver's seat, Officer Mattina found marijuana, a large rock of crack cocaine, and two cell phones on Defendant Cobb. Officer Mattina was aware that Defendant Cobb has a history of gang and drug activity. In addition, Officer Mattina testified that the large rock of crack cocaine and the extra cell phone indicated that Defendant Cobb may be selling drugs. Accordingly, the Court finds that these facts, taken together, are sufficient to establish probable cause to search the vehicle.

# V.     CONCLUSION

After carefully considering the evidence, the parties' filings and arguments, and the relevant legal authorities, the Court finds that there was reasonable suspicion and probable cause to stop Defendant Cobb's vehicle. In addition, the Court finds no basis to suppress the evidence obtained from the search of Defendant Cobb's vehicle. For the reasons set forth herein, it is **RECOMMENDED** that Defendant Cobb's Motion to Suppress [**Doc. 36**] and Defendant Campbell's Motion to Suppress [**Doc. 50**] be **DENIED**.[5]

Respectfully submitted,

　/s H. Bruce Guyton　　　
United States Magistrate Judge

---

[5] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).